## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

DOMENIC P. DISTEFANO and )
DEBRA DISTEFANO )
                              )
       Plaintiffs, )
                              )
  v. )
                              )   C.A. No. N16C-11-015 CLS
KW SOLAR SOLUTIONS, INC., )
and DALE WOLF, )
                              )
       Defendants. )
                              )
                              )
                              )

Date Submitted: March 15, 2019
Date Decided: June 27, 2019

*Upon Defendants KW Solar Solutions, Inc.,*
*and Dale Wolf's Motion to Exclude Plaintiffs' Expert*
**DENIED.**

Blake A. Bennett, Esquire, Christopher H. Lee, Esquire, Cooch and Taylor, P.A., Wilmington, Delaware, Attorney for Plaintiffs.

Robert D. Goldberg, Esquire, Biggs and Battaglia, Wilmington, Delaware, Attorney for Defendants.

**SCOTT, J.**

## Background

Plaintiffs Domenic P. DiStefano and Debra DiStefano claim Negligent Construction/Installation, Breach of Contract, Breach of Express Warranty, Breach of Implied Warranty, and Violation of Consumer Fraud Act against Defendants KW Solar Solutions, Inc., ("Solar") and Dale Wolf.[1] Plaintiffs are the owners of a single family home located at 810 Cheltenham Road, Wilmington, Delaware (the "Property").[2]

On around February 23, 2010, Plaintiffs, Wolf, and Solar entered into a contract whereby Wolf and Solar agreed to install solar panels on the roof of the Property. Solar and Wolf installed the solar panels on or about April 19, 2010.[3] By around early May 2016, water began to leak through the ceiling of the Property.[4] Upon further inspection, Plaintiffs discovered that a portion of their roof had rotted and observed substances around the leak that they suspected to be mold.[5] Thereafter, in the same month, Plaintiffs hired Steven Levy of Certified Mold Inspections, Inc., to "perform an assessment and testing of the impacted areas of the home to validate if an unusual mold condition existed within the property."[6]

---

[1] *See generally* Am. Compl. (June 1, 2018) (D.I. 35).
[2] *Id.* ¶ 2.
[3] *Id.* ¶ 6.
[4] *Id.* ¶ 20.
[5] Pls.' Opp'n to Defs.' Mot. to Exclude Pls.' Expert at 2 (June 22, 2018) (D.I. 38) [hereinafter, "Pls.' Opp'n to Defs.' Mot."].
[6] *Id.*

2

Plaintiffs allege that the solar panel installation process suffered from numerous, serious installation and construction defects and that these design and construction defects created a route for water to infiltrate the building envelope.[7] Plaintiffs assert that as a direct and proximate cause of Defendants' acts and omissions, the defects in the installation process have resulted and will result in severe water and moisture penetration, deterioration, unattractiveness, loss in marketability and market value, structural and physical instability, and other dangerous conditions.[8] The complaint requests damages in the amount necessary to repair the Property and properly compensate the Plaintiffs.[9]

Plaintiffs seek to offer Mr. Levy as an expert witness to testify on how the leak in the attic led to elevated mold levels throughout the house thereby requiring remediation to prevent the mold from damaging the structure of the house.[10]

At the Daubert hearing, Mr. Levy testified that upon arriving to the Property he noticed there was severe damage in the attic and observed mold all around the

---

[7] Am. Compl. ¶¶ 8, 11. Plaintiffs allege that the installation defects include, but are not limited to: (i) use of improper and unsuitable mounting kits; (ii) use of screws where installation called for galvanized nails; (iii) improper cutting of shingles in an attempt to secure the solar panels; (iv) improper cutting of the roof membrane while in the process of cutting shingles; (v) failure to consult an engineer when deviating from standard installation practices; and (vi) failure to assure the installation was water tight. *Id.* ¶ 10.

[8] *Id.* ¶ 14.

[9] *Id.* at 11.

[10] Pls.' Suppl. Br. in Opp'n to Defs.' Mot. to Exclude Pls.' Expert at 1 (Mar. 15, 2019) (D.I. 65) [hereinafter, "Pls.' Suppl. Br."].

ventilation system.[11] Though he testified that there is always a possibility that the mold could have been caused by other sources within the house and admitted that he had not noted other potential sources in his Report, Mr. Levy stated that he did examine other areas of the attic to determine if there were other sources of mold that could have gotten into the attic HVAC system.[12] Mr. Levy testified that in his expert opinion, "it was very obvious . . . how the mold got there."[13]

He further testified that he suspected there might be mold present on the first floor after the May 2016 inspection revealed that there was mold in the attic HVAC system.[14] Mr. Levy testified that, based on his training, he suspected the contamination may have spread to the basement HVAC system.[15] For this reason, Mr. Levy conducted a second inspection in June 2016 where it was confirmed there was mold in the basement HVAC system.[16] In both inspections, Mr. Levy determined the presence of mold from interpreting the lab results of the samples he gathered from the Property during his inspections. From the results, Mr. Levy determined that remediation was necessary based on his experience, training, and the industry standards.[17] Mr. Levy testified that he bases his reports on various

[11] *Id.* at 24.
[12] *Id.* at 24-25.
[13] *Id.* at 7-8, 32-33.
[14] *Id.* at 27.
[15] *Id.*
[16] *Id.*
[17] Tr. Daubert Hearing at 43-47, 50-52, 62-64.

guidance documents referenced in the Reports themselves, with one being the IICRC S520.[18]

Defendants argue that the Court should exclude Mr. Levy's testimony because Mr. Levy is not qualified to offer opinion testimony in this case. Specifically, Defendants contend that (1) Mr. Levy's Reports do not contain an opinion of reasonable professional probability or certainty;[19] (2) Mr. Levy's opinions lack any scientific basis;[20] and (3) Mr. Levy does not have the necessary knowledge, skill, experience, training, or education in the appropriate field.[21]

## Parties' Assertions

Defendants first claim that Mr. Levy is not qualified in the relevant areas.[22] Defendants argue that because Mr. Levy "has no degrees from any academic institution relating to mold" that he is not qualified to testify that "the molds he believes to be present in the Plaintiffs' home pose a danger to them.[23] Defendants contend that Mr. Levy lacks the ability to test for mold himself because he "merely

---

[18] *Id.* at 43 ("[The IICRC S520] is a certification document that talks about source of removal."). "IICRC" stands for "Institute of Inspection Cleaning and Restoration Certification.

[19] Defs.' Memo. in Supp. of Mot. to Exclude Pls.' Expert at 4-6 (Mar. 15, 2019) (D.I. 66) [hereinafter, "Defs.' Memo."].

[20] *Id.* 6-8.

[21] *Id.* at 2-4.

[22] Defs.' Memo at 2.

[23] *Id.* at 2-4.

collects samples and then sends the samples away to a lab where they are tested."[24] For this reason, according to Defendants, Mr. Levy is qualified to "look for mold, but cannot express an opinion on the possible health effects of what he finds."[25] Defendants additionally argue Mr. Levy is neither qualified to opine as to when the observed mold condition began or how it originated, nor is he qualified to testify as to how mold can spread and contaminate other parts of the home. Moreover, Defendants contend that because Mr. Levy is admittedly not a medical professional, he is unable to make a correlation regarding whether or not the molds he found pose a health risk to Plaintiffs.[26] In support of this contention, Defendants direct the Court to three cases wherein the plaintiffs sought damages for physical illness associated with mold exposure.

Plaintiffs respond that Mr. Levy has over sixteen years of experience as a mold inspector and remediator, has performed over 6,000 mold specific investigations, is licensed in other states, and has a variety of certifications in and around building science mold inspection and testing.[27] In particular, Plaintiffs note that Levy has been certified by the National Association of Mold Professionals as a Certified Mold

---

[24] *Id.* at 4.
[25] *Id.* at 2-3.
[26] Defs.' Memo. at 6.
[27] Pls.' Suppl. Br. at 1 (citing Tr. Daubert Hearing at 3-4).

Inspector and Certified Mold Remediator since 2003.[28] Plaintiffs additionally assert that given there are no allegations of any medical effects from the mold, it is irrelevant that Mr. Levy would not be qualified to offer an opinion on the possible health risks to Plaintiffs caused by the presence of mold.[29]

Defendants next assert that the Reports lack the requisite professional certainty or probability. Defendants claim that Mr. Levy's reports do not draw professional opinions, only that Mr. Levy conducted an inspection, drew samples, and sent those samples to independent laboratories for analysis.[30] Defendants reason that Mr. Levy cannot reach a reasonable professional conclusion based on his interpretation of the laboratory results because he did not conduct the laboratory analysis of the samples himself.[31] Further, Defendants claim that the language in Mr. Levy's report indicates there is no articulated standards for typical or permissible levels of mold contamination.[32] Defendants urge that since there is no standard by which one can measure the danger that the mold may pose, Plaintiffs must show that their well-being was endangered by showing that they actually

---

[28] Pls.' Opp'n to Defs.' Mot. at 5 ("As NAMP explains, "[t]his level of membership is only given to Mold Inspectors and Remediators who demonstrate a thorough knowledge and proficiency with all aspects of mold inspections and or remediations.") (citations omitted).
[29] Pls.' Suppl. Br. at 2.
[30] Defs.' Memo. at 3-4.
[31] *Id.*
[32] Defs.' Daubert Br. at 8.

suffered a mold induced injury, or providing a medical professional's conclusion that the slightly elevated mold level posed a danger to them.[33]

Plaintiffs counter that Mr. Levy, as a certified mold inspector, followed industry standards to reach his conclusion that the leak caused by the solar panel installation led to the unacceptable levels of mold identified in his reports.[34] Plaintiffs argue that Mr. Levy's expertise is in understanding how to collect samples for testing and interpreting laboratory results.[35] Plaintiffs contend that Mr. Levy relied on controlling industry guidelines, his extensive training, and his sixteen years of experience to determine that the unusual levels of mold inside the Property required remediation.[36]

Moreover, Plaintiffs argue that the absence of articulated standards or guidelines for interpreting results of fungal samples does not imply there is no basis to determine whether the house had excessive mold.[37] Plaintiffs assert that industry standards require experts in the field to compare the mold levels inside the house and outside the house in addition to reviewing whether the specific types of mold

---

[33] Pls.' Opp'n to Defs.' Mot. at 9.

[34] *Id.* at 7.

[35] *Id.*

[36] Pls.' Suppl. Br. at 5.

[37] *Id.* at 8.

8

are pathogenic or toxic.[38]   According to Plaintiffs, Mr. Levy followed this

methodology and concluded that remediation is necessary.[39]

## Standard of Review[40]

Delaware Rule of Evidence 702 (D.R.E. 702) governs the admissibility of

expert testimony and provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience,
> training, or education may testify in the form of an opinion or otherwise
> if:
>    (a) The expert's scientific, technical, or other specialized knowledge
>        will help the trier of fact to understand the evidence or to
>        determine a fact in issue;
>    (b) The testimony is based upon sufficient facts or data;
>    (c) The testimony is the product of reliable principles and methods;
>        and
>    (d) The expert has reliably applied the principles and methods to the
>        facts of the case.[41]

D.R.E. 702 is substantially similar to Federal Rule of Evidence 702, [42] which

is governed by *Daubert v. Merrell Dow Pharmaceuticals, Inc.,*[43] and *Kumho Tire*

---

[38] *Id.* 8-9.

[39] *Id.* at 9.

[40] *See Williams v. Pizza Hut of Kirkwood Highway, Inc.,* 2011 WL 7453547 (Del. Super. Ct. Nov. 1, 2011); *Livesay v. Heagy,* 2004 WL 3928262, at *1 (Del. Super. Ct. Dec. 20, 2004).

[41] D.R.E. 702.

[42] *See M.G. Bancorporation, Inc. v. Le Beau,* 737 A.2d 513, 521 (Del. 1999), as modified on denial of reargument (May 27, 1999) ("Since Delaware Rule of Evidence 702 is identical to its federal counterpart, we rely upon the United States Supreme Court's most recent authoritative interpretation of Federal Rule of Evidence 702.").

[43] 509 U.S. 579 (1993).

9

*Co., Ltd. v. Carmichael.*[44] In *Daubert*, the United States Supreme Court held that F.R.E. 702 requires the trial judge to act as a "gatekeeper" and determine whether the proffered expert testimony is not only relevant, but reliable.[45] The factors considered in this determination are "meant to be helpful, not definitive, and may or may not be pertinent depending on the nature of the issue, an expert's particular expertise, and the subject of the testimony."[46] Those factors include:

> (1) whether a theory or technique has been tested;
> (2) whether it has been subjected to peer review and publication;
> (3) whether a technique had a high known or potential rate of error and whether there are standards controlling its operation; and
> (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.[47]

The focus of the *Daubert* analysis does not concern the resulting conclusions but rather the principles and methodology used to form the expert's opinion.[48]

In addition to the *Daubert* analysis, the Delaware Supreme Court created a five-prong test in determining the admissibility of scientific or technical expert's testimony. Therefore, this Court must also determine whether:[49]

1. The witness is qualified;[50]

---

[44] 526 U.S. 137 (1999).
[45] *Daubert*, 509 U.S. at 589.
[46] *Norwood v. State*, 813 A.2d 1141 (Table), 2003 WL 29969, at *2 (Del. 2003).
[47] *Daubert*, 509 U.S. at 592-93.
[48] *Id.* at 594.
[49] *Williams v. Desperito*, 2011 WL 7452803, at *3 (Del. Super. Ct. Oct. 24, 2011) (citing *Bowen v. E.I. DuPont de Nemours & Co., Inc.*, 906 A.2d 787, 795 (Del. 2006); *Tolson v. State*, 900 A.2d 639, 645 (Del. 2006)).
[50] *See* D.R.E. 702.

2. The evidence is otherwise admissible, relevant, and reliable;[51]
3. The bases for the opinion are those reasonably relied upon by experts in the field;[52]
4. The specialized knowledge being offered will assist the trier of fact to understand the evidence or determine a fact in issue;[53] and
5. The evidence does not create unfair prejudice, confuse the issues, or mislead the jury.[54]

"[T]he proponent of the proffered expert testimony bears the burden of establishing the relevance, reliability, and admissibility by a preponderance of the evidence."[55] However, the proponent must only demonstrate that the expert's opinions are reliable.[56] Thus, where an expert's opinion is challenged, "the trial judge must decide if the expert's testimony 'has a reliable basis in the knowledge and experience of the relevant discipline.'"[57]

## Discussion

The Court finds that Mr. Levy is qualified to provide expert testimony regarding the presence and levels of mold in the areas of the Property that he tested during each inspection.[58] The standard set by D.R.E. 702 requires of an expert that

---

[51] *See* D.R.E. 401; D.R.E. 402.
[52] *See* D.R.E. 703.
[53] *See* D.R.E. 702.
[54] *See* D.R.E. 403
[55] *Minner v. Am. Mortg. & Guar. Co.*, 791 A.2d 826, 843 (Del. Super. Ct. 2000).
[56] *Williams*, 2011 WL 7452803, at *3 (citing *In re Asbestos Litig.*, 911 A.2d 1176, 1201 (Del. Super. 2006)).
[57] *M.G. Bancorporation*, 737 A.2d at 521 (citing *Kumho*, 526 U.S. at 138 (quoting *Daubert*, 509 U.S. at 592)).
[58] Each Report states that "the forensic sampling results [of the tests collected during the inspection] are based only on the areas sampled and no conclusions can be made

11

their "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."[59] Delaware precedent likewise provides that a "witness is qualified as an expert by knowledge, skill, experience, training, or education."[60]

According to Mr. Levy's curriculum vitae, he is a certified: (1) mold inspector and mold remediator with the National Association of Mold Professionals; (2) indoor environmentalist and mold remediator with the Indoor Air Quality Association; and (3) infrared thermographer with the Infraspection Institute. He is an active member of the Indoor Air Quality Association, and is a council certified microbial consultant and indoor environmentalist with the same. Additionally, Mr. Levy is a licensed mold assessor in the state of Florida and the state of New York.

Mr. Levy is qualified to provide an expert opinion on mold assessment and inspection, not only based on his experience, but on his training and certifications in the relevant field.[61] However, under the facts of this case, the Court finds that Mr.

---

regarding the air quality or unusual mold conditions for the rest of the property." Ex. 2 of Pls.' Suppl. Br. at 19 [hereinafter, "May Report"]; Ex. 3 of Pls.' Suppl. Br. at 11 [hereinafter, "June Report"].

[59] D.R.E. 702.

[60] *Sturgis v. Bayside Health Ass'n Chartered*, 942 A.2d 579, 584 (Del. 2007).

[61] The United States Supreme Court has made clear that the "test of reliability is 'flexible'" and does not necessarily turn on a single factor. *Kumho*, 526 U.S. at 141-142 (1999) (quoting *Daubert*, 509 U.S. at 594-95 (1993)); *see, e.g., Chan Young Lee v. Choice Hotels Int'l, Inc.*, 992 A.2d 1236, 2010 WL 1730674 at *5 (Del. 2010) (finding the plaintiffs' expert sufficiently qualified to testify on pool compliance standards based upon the expert's experience and specialized knowledge).

Levy is not qualified to testify as to the remediation necessary to prevent the mold from damaging the Property's structure.[62] Plaintiffs have alleged causes of action sounding in Negligent Construction/Installation, Breach of Contract, Breach of Express Warranty, Breach of Implied Warranty, and Violation of Consumer Fraud Act against Defendants. Although Mr. Levy explained in his testimony that mold "breaks down dead matter" and thus "can destroy the structural integrity of the home, the structure,"[63] his qualifications are insufficient to provide an expert opinion on the extent of damage the level of mold detected in the Property has on the structure of the home.

The Court next finds Mr. Levy's methodology for mold testing sufficiently reliable under *Daubert.* Mr. Levy conducted testing of the Property on two occasions and recorded the findings of each visit in two separate reports (together, the "Reports").[64] In May 2016, Mr. Levy tested the second floor and the attic, including the attic roof sheathing directly affected by the leak.[65] The May Report reveals that Mr. Levy collected air samples from the master bedroom and the attic,[66]

---

[62] *See* Pls.' Suppl. Br. at 1.

[63] Tr. of Daubert Hearing at 42; *see also id.* at 42-58.

[64] Pls.' Opp'n to Defs.' Mot. at 2.

[65] *See generally* May Report.

[66] *Id.* at 2, 5; *see also id.* at 19-20 ("Air samples are collected via a Spore trap Cassette for collecting viable and non-viable airbone mold spore samples. Spore trap cassette samples were collected utilizing a spore trap cassette in conjunction with a high volume air sampler. Ambient air samples were collected for five minute period at an airflow rate of 15 liters per minute for inside and outside ambient air.").

swab samples from the attic roof decking and the attic roof sheathing,[67] as well as a survey of indoor molds (SIMS) sample and a Mycotoxin sample from the attic HVAC system.[68] Additionally, Mr. Levy collected an air sample from the back and the front of the property as a comparison sample to serve as a baseline for reference.[69] In June 2016, Mr. Levy tested the first floor and the basement of the Property.[70] The June Report indicates that Mr. Levy collected air samples from the ambient living area and the basement HVAC area,[71] as well as a mycotoxin sample, a swab sample, and SIM sample from the basement HVAC system.[72] Mr. Levy also collected comparison outside air samples from the front and the back of the home.[73]

The Reports state that Mr. Levy used a moisture meter and an infrared camera to identify elevated moisture in the building materials.[74] Each Report presents the results of the "limited visual survey of the property" and includes general and specific "mold decontamination recommendations."[75] For each area of the Property tested, the Reports contain photographs taken at the time the samples were collected.

---

[67] *Id.* at 6, 9.
[68] *Id.* at 11-12. *See id.* at 23 ("[S]urvey of indoor molds (SIMS)").
[69] *Id.* at 16-17. *See id.* at 20 ("The Outdoor reference air test is very helpful in evaluating where there is an internally generated mold problem.").
[70] *See generally* June Report.
[71] *Id.* at 2, 8.
[72] *Id.* at 3-5.
[73] *Id.* at 9-10.
[74] *Id.* at 11; May Report at 19.
[75] May Report at 1.

14

Where air or surface samples were taken during the inspection, the results of the "completed independent laboratory analysis" are included as an attachment to the Report.[76] All collected samples were sealed, labeled, and delivered to an independent laboratory within 24 hours.[77] The Reports provide a "scope/protocol for remediation" of the affected areas that the lab results indicated an unusual mold condition or the presence of molds.

Moreover, the Reports state that such advised remediation for the impacted areas follows the appropriate IICRC S520 guidelines and or other generally accepted standard of care guidelines, and note the following:

> It is generally accepted in the industry that indoor fungal growth is undesirable and inappropriate, necessitating removal or other appropriate remedial actions. The New York City guidelines and EPA guidelines for mold remediation in schools and commercial buildings define the conditions warranting mold remediation.[78]

At the *Daubert* hearing, Mr. Levy explained that in conducting a mold investigation, he collects a sample of suspected mold and then sends the samples to an accredited independent lab for analysis of the samples to identify the presence of mold.[79] He further testified that it is common, well-accepted practice in the industry

---

[76] *Id.*

[77] May Report at 20.

[78] May Report at 21; June Report at 13.

[79] Tr. Daubert Hearing at 18-19. Levy provided the following summary of the procedure used to assess for mold:

to rely upon an independent laboratory.[80] Thereafter, Mr. Levy reviews the results of the lab tests and, together with his observations, uses the information gathered to develop the Reports.

It is clear from the Reports and Mr. Levy's testimony that the mold inspections involved the objective methods of measuring and documenting the presence and amount of mold in various areas of the Property in accordance with controlling industry standards. Accordingly, the Court finds that Mr. Levy's methodology is sufficiently reliable as to aid the jury in reaching accurate results with regard to the presence of mold.[81]

In regard to the cause of the mold in the Property, however, the Court finds that Mr. Levy is not qualified to testify that improper solar panel installation resulted in the levels of mold revealed from his inspections. During his testimony, Mr. Levy

---

[T]esting is done when you go out into an environment, a home . . . identify source areas . . . that may appear to be impacted by water damage. There's some suspicious, what we call growth. It looks like it might be mold. We would collect it through a variety of different means . . . a swab . . . a tape lift . . . a hair sample . . . dust. We send it into a lab. The lab would then take that sample. They prep it. And they would look at it either under a microscope or depending on the sampling methodology that they employ, they would use some other kind of technology to identify if there was mold there or not. . . . I don't do the analysis. I send it out to a third-party lab. I am certified and licensed to collect them though.

*Id.*

[80] *Id.* at 46.
[81] *See In re Paoli R.R. Yard Pcb Litig.*, 35 F.3d 717, 744 (3d Cir. 1994) (internal quotation marks omitted).

admitted that he was "hired to identify where there was mold," and acknowledged that there is nothing in his background that would allow him to determine whether the installation was defective.[82] When further questioned by the Court about his expertise to determine a defective solar panel installation, Mr. Levy testified: "Other than having just a basic knowledge of how things should be installed on the outside of the home . . . nothing."[83] Despite this, Mr. Levy expressed in both Reports that the roof leak resulted from "wrongly" or "improperly" installed solar panels which caused water to seep into the attic and other areas of the Property.[84]

While Mr. Levy's qualifications permit him to testify on general matters known to experts in his industry, they do not grant him the expertise necessary to provide conclusive opinions regarding the specific source of the mold in this case.[85] This Court has held that "[c]ausation of injury must be supported by more than the word of [the expert]."[86] Put differently, "an expert's failure to explain the basis for

---

[82] Tr. Daubert Hearing at 7, 9 ("I'm not an engineer. I have not installed any solar panels. . . . I can only tell you based on what I see and what I've assessed over the years.").

[83] *Id.* at 8.

[84] May Report at 3, 10, 15, 18-19; June Report at 11.

[85] Such general industry knowledge might include: common sources of mold, the role of an HVAC system in releasing mold into a home's living space, identifying mold in different areas of the home, etc. *See generally* Environmental Protection Agency, *Mold Remediation in Schools and Commercial Buildings*, EPA 402-K-01-001 (Sept. 2008).

[86] *Jones v. Astrazeneca, LP*, 2010 WL 1267114, at *9 (Del. Super. Ct. Mar. 31, 2010) (citing *Minner v. Am. Mortg. & Guar. Co.*, 791 A.2d 826, 851 (Del. Super. Ct. 2000)).

an important inference mandates . . . exclusion of his or her opinion."[87]  The Court will not accept Mr. Levy's opinion simply because he says so.  Because Mr. Levy's opinion on the installation of the solar panels as the cause for the molds discovered in the home, is not based on sufficient facts or data and is not the product of reliable methods, it fails to meet *Daubert*.[88]

## Conclusion

Plaintiffs seek to offer Mr. Levy's opinion that the leak in the attic of the Property led to elevated mold levels throughout the house and require remediation to prevent the mold from damaging the home's structure.  The Court finds that, under the facts of this case, Mr. Levy is sufficiently qualified to offer an expert opinion on mold inspection and testing, based on the training, knowledge and experience he has in this area as set forth in his curriculum vitae and described above.

For the forgoing reasons, Defendant's Motion to Exclude Plaintiffs' Expert is **DENIED**.

**IT IS SO ORDERED.**

_____

**Judge Calvin L. Scott, Jr.**

---

[87] *See id.* at *9 n.90.

[88] *Wiercinski v. Brescia Properties, LLC*, 2015 WL 227980, at *3 (Del. Super. Ct. Jan. 15, 2015).

18